EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
KATHARINE SCHONBACHLER
Assistant United States Attorney
Asset Forfeiture Section
California Bar No. 222875
    Federal Courthouse, 14th Floor
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3172
    Facsimile: (213) 894-7177
    E-mail: Katie.Schonbachler@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>        v.<br><br>$8,000,000.00 IN FUNDS,<br><br>    Defendant. | No. CV 16-6228<br><br>VERIFIED COMPLAINT FOR FORFEITURE<br><br>[18 U.S.C. §§ 981(a)(1)(C)]<br><br>[F.B.I.] |

    The United States of America brings this claim against the defendant $8,000,000.00 in Funds and alleges as follows:

///

## JURISDICTION AND VENUE

1. This is a civil forfeiture action brought pursuant to 18 U.S.C. § 981(a)(1)(C).

2. This court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in this district pursuant to 28 U.S.C. § 1395(b).

## PERSONS AND ENTITIES

4. The plaintiff is the United States of America.

5. The defendant is $8,000,000.00 in Funds deposited into a United States Marshals Service bank account on or about June 30, 2016 at the direction of Sean Ewing ("Ewing") pursuant to a settlement agreement wherein Ewing agreed to forfeit the defendant funds to the United States.[1]

6. The interests of Ewing may be adversely affected by these proceedings.

7. The defendant funds are in the custody of the United States Marshals Service, where they shall remain subject to this court's jurisdiction during the pendency of this action.

///

///

---

[1] Specifically, in United States v. Ewing, No. 16-CR-317 (C.D. Cal.), Ewing agreed to forfeit the defendant funds "because it may present profits from accretion of stock and dividends traceable to the alleged criminal conduct committed by several individuals, as charged in the case captioned United States v. Homm, et al., No. 13-CR-183 (JAK) (C.D. Cal.)."

EVIDENCE SUPPORTING FORFEITURE

8. The defendant funds are proceeds from an international securities fraud scheme that involved the manipulation of billions of shares in United States "penny stock" companies.[2]

9. In December 2015, a Grand Jury in the Central District of California returned a superseding indictment in United States v. Florian Wilhelm Jurgen Homm, et al., CR 13-183, charging Homm and others with several violations, including conspiracy to commit securities fraud in violation of 18 U.S.C. § 1349; securities fraud in violation of 18 U.S.C. § 1348; money laundering conspiracy in violation of 18 U.S.C. § 1956 and engaging in monetary transactions in criminally-derived proceeds in violation of 18 U.S.C. § 1957.

10. The Federal Bureau of Investigation ("FBI") investigated the underlying international securities and investment adviser fraud matter involving a scheme to defraud investors in eight Cayman Islands-based hedge funds managed by Absolute Capital Management Holdings Limited ("ACMH"), an investment advisory company. As explained further below, between about June 2003 and September 2007, Homm, the Chief Investment Officer of ACMH, along with others, caused the hedge funds to purchase billions of shares in various United States penny stock companies through Hunter World Markets, a broker-dealer based in Los Angeles. By trading the penny stocks among the various hedge funds, Homm and others manipulated the prices of the penny stocks, causing the hedge funds to report falsely inflated financial results, in a practice called "portfolio pumping." Homm and others made misrepresentations to fund investors in the United States and elsewhere, through wire transmissions that traveled in U.S. interstate and foreign commerce.

///

---

[2] The term "penny stock" generally refers to low-priced (below $5 and often below $1) securities of very small companies that typically trade on an over-the-counter quotation service (rather than a national stock exchange), but could also trade on foreign securities exchanges.

11. The defendant funds represent proceeds of the fraud, which proceeds ultimately were obtained by Ewing, who was the Chief Executive Officer ("CEO"), Chief Operating Officer ("COO"), and Chairman of the Board of Directors of ACMH, as well as a co-founder of ACMH with Homm and others. Ewing was also a substantial shareholder of ACMH stock. As of March 2006, when ACMH became listed on the London Stock Exchange, Alternative Investment Market ("AIM") in the United Kingdom, Ewing controlled 12.15% of ACMH shares through an investment vehicle named Doyne Investments Limited ("Doyne").

12. Beginning in approximately 2003, ACMH was the investment manager for eight Cayman Islands-based hedge funds (the "Absolute Funds" or "Funds") which purportedly had $2.1 billion in assets under management as of August 31, 2007. The Absolute Funds are further described as follows:

   a. Absolute East West Master Fund Limited ("East West Fund") was a master feeder hedge fund marketed by ACMH as focused "principally on the old and new European Union members as well as potential EU candidates and their neighbours."

   b. Absolute Activist Value Master Fund Limited ("Activist Value Fund") was a master feeder hedge fund marketed by ACMH as focused "on Large Caps in Western European and other developed markets."

   c. Absolute Large Cap Master Fund Limited ("Large Cap Fund") was a master feeder hedge fund marketed by ACMH as focused on large cap equities in Western European and other developed markets utilizing bottom up research and controlled by a strict stop loss policy, meaning that certain criteria would trigger automatic sales of any investment incurring losses.

   d. Absolute European Catalyst Fund Limited ("European Catalyst Fund") was a hedge fund marketed by ACMH as focused on "European stocks long and short which are catalyst driven."

   e. Absolute Germany Fund Limited ("Germany Fund") was a hedge fund marketed by ACMH as focused "primarily in long and short positions in German

1 equities and other securities…"

2       f.    Absolute India Fund Limited ("India Fund") was a hedge fund
3 marketed by ACMH as focused primarily on long and short positions in Indian equities
4 and other securities.

5       g.    Absolute Octane Master Fund Limited ("Octane Fund") was a master
6 feeder fund marketed by ACMH as seeking an absolute return for investors with a high
7 risk tolerance and a view to capital gain on a yearly basis.

8       h.    Absolute Return Europe Fund Limited ("Return Europe Fund") was a
9 hedge fund marketed by ACMH as focused "on European stocks long and short based on
10 bottom up research and controlled by a strict stop loss policy."

11     13.    As adviser to the Absolute Funds, ACMH charged each fund a monthly
12 management and performance fee based on the fund's net asset value, which was
13 calculated by the fund's administrator, but was inflated due to the portfolio pumping
14 practice described below.

15     14.    From about October 2001 through September 18, 2007, Homm was the
16 Chief Investment Officer of ACMH (and its predecessor company, FM Fund
17 Management). Homm held powers of attorney that enabled him unilaterally to invest on
18 behalf of the Absolute Funds. In this position, Homm had primary control over
19 investment decisions for the Funds.

20     15.    Hunter World Markets was a broker-dealer registered with the United States
21 Securities and Exchange Commission ("SEC") and the United States Financial Industry
22 Regulatory Authority ("FINRA"). Todd Ficeto was the President and Director of Hunter
23 World Markets and managed all of its business. Homm and Ficeto each held 50% co-
24 ownership in Hunter World Markets, and the Absolute Funds had securities accounts at
25 Hunter World Markets.

26     16.    From at least June 2003 through September 2007, Homm and others at
27 ACMH, along with Ficeto at Hunter World Markets, caused the Absolute Funds to
28

purchase billions of shares in United States-based penny stock companies[3] through private direct (non-public) sales of securities. These penny stock companies were targeted and brought to ACMH's attention by Ficeto, who provided investment banking services to the companies and offered to assist them in becoming publicly traded in the United States. Upon becoming publicly traded, these companies ("the penny stock companies") were traded on the United States OTC ("over-the-counter") listing services.

17. Hunter World Markets charged substantial commissions on these private placements. At the same time, Homm and Ficeto caused shares of the penny stock companies, or warrants for the purchase of such shares, to be issued to Hunter World Markets, Ficeto, and Colin Heatherington ("Heatherington"), individually and through CIC Global Capital Limited, a company owned by Heatherington and his brother.

18. In general, these penny stock companies were not publicly traded until the Absolute Funds began to purchase their shares. After the Absolute Funds controlled all or a substantial portion of the freely tradable shares of the penny stock companies, Homm, Heatherington, and Ficeto caused the Absolute Funds to trade shares of the penny stock companies among the various accounts of the Absolute Funds at Hunter World Markets at increasingly higher prices, driving up the stock prices and creating the false appearance of a market in the stocks and illusory profits to the Absolute Funds that held the penny stocks.

19. During the period of the scheme, using a secret (and illegal) instant messaging system, Heatherington sent hundreds of instant messages ("IMs") from ACMH in Palma de Mallorca, Spain to Hunter World Markets in Beverly Hills, California.[4] The secret IM system allowed ACMH's and Hunter World Market's traders

---

[3] The companies included: Cyberkinetics Neurotechnology Systems, Inc.; Universal Guardian Holdings Inc.; Berman Center, Inc.; MicroMed Cardiovascular, Inc.; Duravest, Inc., Inc.; Intermetro Communications, Inc.; ProElite, Inc.; Biolase Technology Inc.; Java Detour, Inc.; Logistical Support, Inc.; Quest Group International, Inc.; and Passport Restaurants, Inc.

[4] As a broker-dealer, Hunter World Markets was legally required to use only the Bloomberg messaging system, which is archived for regulatory review.

to communicate without fear that their market manipulation would be discovered by regulators or ACMH employees and executives who were non-participants in the scheme. As reflected in those secret IMs, ACMH's trader, generally Heatherington, would instruct Hunter World Market's trader, T.S.A., to place matched orders, engage in transactions that marked the close of the market, and engage in other manipulative trading techniques for the purpose of artificially raising or propping up the share prices of the penny stock companies.

20. These manipulative trades caused the Absolute Funds' financial success to be overstated. Absolute Funds' documents reflect that, at the artificially elevated prices, the penny stock holdings were material to the net asset values ("NAVs") of the Absolute Funds.[5] Indeed, by September 19, 2007, at Homm's direction and with assistance of Heatherington and others, the Absolute Funds' investments in the penny stock companies purported to exceed $440 million, constituting nearly half of some of the Funds' net asset values. The trades also caused some of the Funds at particular times to show millions of dollars in false, unrealized gains.

21. By artificially increasing the NAVs of the Absolute Funds, the co-conspirators generated large and unwarranted management and performance fees to ACMH, which in turn enriched Homm, Ewing and other ACMH executives as recipients of a portion of those fees. In total, from 2005 through June 2007, ACMH received approximately €140 million from the Absolute Funds in performance and management fees. The inflated NAVs of the Absolute Funds also increased the market value of the stock of ACMH, the investment adviser to the Absolute Funds. As noted above, Ewing held a substantial percentage of the stock (while Homm held a majority interest in the stock).

///

---

[5] Net asset value, the value of a fund's assets minus its liabilities, is an important barometer used to evaluate the value and profitability of an investment in a hedge fund.

22. The Absolute Funds have estimated that the Funds lost almost $200 million from the costs associated with the purchase and manipulation of the penny stocks, including investment banking fees, stock subscriptions and market purchases, and commissions.  The $200 million does not include performance and management fees paid to ACMH on the basis of the inflated financial results, or the gains that Homm and Ewing received by selling ACMH shares.

23. Following the resignation of Homm in September 2007, the fraud was disclosed to the general public.  Using conservative parameters for the time period from May 5, 2006 through September 17, 2007, Ewing received at least $8 million in fraud proceeds from the sale of shares of ACMH stock, from dividends earned on ACMH stock, and from the sales of shares of certain Absolute Funds and Clinuvel Pharmaceuticals stock.  These proceeds were deposited in and transferred between several accounts in various countries that Ewing controlled.

## CLAIM FOR RELIEF

24. Plaintiff alleges that the defendant funds are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) because they represent or are proceeds traceable to one or more violations of 18 U.S.C. § 1349 (conspiracy to commit securities fraud) and 18 U.S.C. § 1348 (securities fraud).  These violations constitute "specified unlawful activity" pursuant to 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(D) (offenses involving fraud in the sale of securities, punishable under any United States law).

WHEREFORE, plaintiff United States of America prays:

(a) that due process issue to enforce the forfeiture of the defendant funds;

(b) that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

///

///

(c) that this Court decree forfeiture of the defendant bank funds to the United States of America for disposition according to law; and

(d) for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: August 19, 2016

EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section

*/s/ Katharine Schonbachler*
KATHARINE SCHONBACHLER
Assistant United States Attorney

Attorneys for Plaintiff
United States of America

# VERIFICATION

I, Daniel M. Parker, hereby declare that:

1. I am a Special Agent with the Federal Bureau of Investigation and am the case agent for the forfeiture matter entitled <u>United States of America v. $8,000,000.00 in Funds</u>.

2. I have read the above Verified Complaint for Forfeiture and know its contents. It is based upon my own personal knowledge and reports provided to me by other law enforcement agents.

3. Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed August 17, 2016 in Los Angeles, California.

_____
DANIEL M. PARKER